UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————— X

FELIKS ROITMAN & YEKATERINA
SHKOLNIK,

                    Plaintiffs,                          **REPORT & RECOMMENDATION**

            v.                                              23-CV-6159 (ENV) (LKE)

T-MOBILE USA INC.,

                    Defendant.

———————————————————— X

**LARA K. ESHKENAZI**, United States Magistrate Judge:

    Before the Court is the motion of Defendant T-Mobile USA, Inc. ("Defendant" or "T-Mobile") to compel Plaintiffs Feliks Roitman and Yekaterina Shkolnik to arbitrate their claims and to stay this action pending the completion of arbitration. For the reasons set forth below, the Court respectfully recommends granting Defendant's motion.

I.    **BACKGROUND**

    A.    **Facts**

    Plaintiffs are a married couple residing in New York who were customers of T-Mobile. (Compl., ECF No. 1 ¶¶ 9, 13-15; Aff. of Judy Sanchez ("Sanchez Aff."), ECF No. 16 ¶¶ 21-23.) T-Mobile is "the third-largest cellular telecommunications provider in the United States[.]" (Compl. ¶ 10.) On October 24, 2020, Roitman signed the first of seven contracts with T-Mobile for new devices, including multiple iPhones, an Apple watch, and a Galaxy Z Flip3 phone, along with new lines of service. (Sanchez Aff. ¶¶ 4, 9, Ex. 1, Terms & Conditions ("T&Cs"), Ex. 2, T-Mobile Receipt dated October 24, 2020 ("Receipt"); Compl. ¶ 14.) The purchase receipts, which show Roitman's signature, state "if you activate or use T-Mobile service, or purchase a T-Mobile

device you agree to T-Mobile's Terms and Conditions [('T&Cs')]." (Sanchez Aff. ¶¶ 9-10; Receipt.) Roitman signed the last of the Service Agreements activating cell phone service for his wife, Shkolnik, on November 6, 2020. (Sanchez Aff. ¶¶ 14-15.)

Roitman also entered Equipment Installation Plan ("EIP") contracts for new devices on January 14, 2021, and September 2, 2021. (Sanchez Aff. ¶¶ 17, 19, Exs. 8, 10, EIP Contract and Disclosures ("EIP Contracts").) According to Defendant, since 2019, T-Mobile has used tablets, known as REMOs, to assist customers with transactions. (Sanchez Aff. ¶ 10.) Upon the completion of a transaction with T-Mobile in a store, each customer is handed a tablet "to review and scroll through" the purchase agreement including the EIP. (*Id*. ¶ 10.) T-Mobile further alleges that "all of the contract terms were presented on the screen" and the "customer was then asked to electronically sign…." (*Id*.) "The T&Cs were not displayed on the devices directly but instead referenced in the agreements presented on the devices." (*Id*.) The contract terms on the receipt stated "**Disputes**. T-Mobile REQUIRES ARBITRATION OF DISPUTES unless for new customers YOU OPT OUT WITHIN 30 DAYS OF ACTIVATION, or for existing customers YOU PREVIOUSLY OPTED OUT PURSUANT TO T-MOBILE'S TERMS AND CONDITIONS. For details see T-Mobile's Terms and Conditions at www.T-Mobile.com/terms-conditions." (Receipt.)

The pertinent provisions of the Terms and Conditions are as follows:

> By accepting these T&Cs, you are agreeing to resolve any dispute with us through binding arbitration or small claims dispute procedures (unless you opt out), and to waive your rights to a jury trial and to participate in any class action suit. For additional terms and conditions governing a dispute between us, including how to dispute Charges assessed to you on your bill, choice of law, disclaimers of certain warranties, limitations of liabilities, and your indemnification obligations, see "Other Terms Regarding Dispute Resolution" below.

**Dispute Resolution and Arbitration.** **YOU AND WE EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THE AGREEMENT, OUR PRIVACY POLICY, OUR SERVICES, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT.** This includes any claims against other parties relating to Services or Devices provided or billed to you (such as our suppliers, dealers, authorized retailers, or third party vendors) whenever you also assert claims against us in the same proceeding. You and we each also agree that the Agreement affects interstate commerce so that the Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this dispute resolution provision (despite the general choice of law provision set forth below). THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. THE ARBITRATOR MUST FOLLOW THIS AGREEMENT AND CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES).

Notwithstanding the above, **YOU MAY CHOOSE TO PURSUE YOUR CLAIM IN COURT AND NOT BY ARBITRATION IF YOU OPT OUT OF THESE ARBITRATION PROCEDURES WITHIN 30 DAYS FROM THE EARLIER OF THE DATE YOU PURCHASED A DEVICE FROM US OR THE DATE YOU ACTIVATED A NEW LINE OF SERVICE (the "Opt Out Deadline").** You must opt out by the Opt Out Deadline for each line of Service. You may opt out of these arbitration procedures by calling 1- 866-323-4405 or online at www.T-Mobiledisputeresolution.com. **Any opt-out received after the Opt Out Deadline will not be valid and you will be required to pursue your claim in arbitration or small claims court…**

**Jury Trial Waiver.** If a claim proceeds in court rather than through arbitration, **YOU AND WE EACH WAIVE ANY RIGHT TO A JURY TRIAL…**

**\*CHOICE OF LAW**
This Agreement is governed by the Federal Arbitration Act, applicable federal law, and the laws of the state or jurisdiction in which your billing address in our records is located, without regard

to the conflicts of laws rules of that state or jurisdiction. Foreign laws do not apply. Arbitration or court proceedings must be in the county and state or jurisdiction in which your billing address in our records is located, but not outside the U.S.; or Puerto Rico."

(T&Cs.) The pertinent provisions of the EIP contracts are as follows:

> **\* Dispute Resolution and Arbitration.** <u>If you are a Covered Buyer, the following provisions relating to arbitration do not apply to this EIP.</u> This section describes how any disputes between you and T-Mobile will be resolved. WE AND YOU EACH AGREE THAT, EXCEPT AS PROVIDED BELOW, ANY AND ALL CLAIMS OR DISPUTES IN ANY WAY RELATED TO OR CONCERNING THIS AGREEMENT, OUR PRIVACY POLICY, OUR SERVICES, EQUIPMENT, DEVICES OR PRODUCTS, INCLUDING ANY BILLING DISPUTES, WILL BE RESOLVED BY BINDING ARBITRATION OR IN SMALL CLAIMS COURT. This includes any claims against other parties relating to services or equipment provided or billed to you (such as our suppliers, dealers, authorized retailers, or third-party vendors) whenever you also assert claims against us in the same proceeding. You and we also each agree that this agreement affects interstate commerce so that the Federal Arbitration Act and federal arbitration law, not state law, apply and govern the enforceability of this dispute resolution provision (despite the general choice of law provision set forth below). THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. THE ARBITRATOR MUST FOLLOW THIS AGREEMENT AND CAN AWARD THE SAME DAMAGES AND RELIEF AS A COURT (INCLUDING ATTORNEYS' FEES).
>
> Notwithstanding the above, YOU MAY CHOOSE TO PURSUE YOUR CLAIM IN COURT AND NOT BY ARBITRATION IF YOU OPT OUT OF THESE ARBITRATION PROCEDURES WITHIN 30 DAYS FROM THE EARLIER OF THE DATE YOU PURCHASED EQUIPMENT FROM US OR THE DATE YOU ACTIVATED A NEW LINE OF SERVICE (the "Opt Out Deadline"). You must opt out by the Opt Out Deadline for each line of Service. You may opt out of these arbitration procedures by calling 1-866-323-4405 or online at www.T-Mobiledisputeresolution.com. **Any opt-out received after the Opt**

**Out Deadline will not be valid and you will be required to pursue your claim in arbitration or small claims court.**

(Sanchez Aff. Exs. 3, 4, 7, 8, 10 ("EIP Contracts").)

T-Mobile updated its Service Agreement on March 1, 2021, but the Terms and Conditions that Roitman agreed to in 2020 and the Terms and Conditions from March 1, 2021, are identical with respect to the arbitration agreement. (Sanchez Aff. ¶¶ 6-8; T&Cs; Sanchez Aff., Ex. 9, Updated Terms & Conditions ("Updated T&Cs").) T-Mobile allows its customers thirty days from the signing of a contract to opt-out of the arbitration provision. (Sanchez Aff. ¶ 8; T&Cs; Updated T&Cs.) Plaintiffs did not exercise the opt-out option. (*See generally* Mem. in Opp.; *see also* Compl.; Sanchez Aff. ¶ 20.)

On November 29, 2021, Plaintiffs allege that a T-Mobile employee initiated an unauthorized swap of Plaintiff's SIM cards, known as "SIM card swapping." (Compl. ¶¶ 2-3.) This scheme "elicits the help of a carrier's representative to procure a SIM card to an account they do not own, placing that SIM card in their own phone, and gaining complete access to all of the data which the original owner had." (*Id.* ¶ 3.) Plaintiffs allege this unauthorized access led to an unknown third party's ability to access Plaintiffs' financial accounts, which resulted in a loss of $131,000. (*Id.* ¶¶ 18-19, 35.) The Complaint alleges that T-Mobile made misleading statements representing its priority of safeguarding information, which Plaintiffs relied on when entering a contract with T-Mobile. (*Id.* ¶¶ 129-32.) Additionally, the Complaint provides that T-Mobile recognizes its duty to protect customers' personal information, such that it will "properly authenticate any party seeking access to [customer proprietary network information ("CPNI")]. This means, for example, T-Mobile must… require a valid photo ID for access in a retail location." (*Id.* ¶ 44.) Plaintiffs further allege they were told by a T-Mobile representative that the SIM card swap "was done without ID, and involved a manager override to accomplish." (*Id.* ¶ 29.)

### B.    Procedural History

Plaintiffs filed their Complaint against T-Mobile on August 16, 2023. (Compl., ECF No. 1.) The Complaint asserts, *inter alia*, claims for negligence, breach of contract, violations of the Federal Communications Act, negligent infliction of emotional distress, aiding and abetting conversion, violation of the Computer Fraud and Abuse Act, and violation of the New York General Business Laws §§ 349 and 350. (Compl. ¶ 8.)

On January 19, 2024, Defendant filed the fully briefed motion to compel arbitration and stay this action. (ECF Nos. 14-21.) On February 3, 2025, the Honorable Judge Eric N. Vitaliano referred the motion to compel arbitration to the undersigned magistrate judge for report and recommendation. (ECF Order dated February 3, 2025.)

## II.    LEGAL STANDARD

The Federal Arbitration Act ("FAA") provides that "a written provision in any…contract evidencing a transaction involving commerce to settle by arbitration… shall be valid, irrevocable, and enforceable…" 9 U.S.C. § 2. The FAA indicates a "national policy favoring arbitration" where the parties have agreed to arbitrate. *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 228 (2d Cir. 2016). The Supreme Court has held that "arbitration agreements are simply contracts" which can resolve disputes "'that the parties have agreed to submit to arbitration.'" *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 943 (1995)). The court must first determine "whether a valid arbitration agreement exists" by evaluating traditional contract principles. *Id.* at 149.

Arbitration is a matter of contract, and a party cannot be compelled to arbitrate disputes to which it has not agreed. *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015). Therefore, the court must answer two preliminary questions: "1) whether the parties agreed to

arbitrate; and, if so, 2) whether the claims are within the scope of the arbitration agreement." *Id.* at 394. The non-moving party "bears the burden of showing that the arbitration agreement is invalid or does not encompass the claims at issue." *Padula v. eBay*, No. 21-CV-5391 (MKB) (SJB), 2022 WL 18456614, at *4 (E.D.N.Y. Dec. 29, 2022) *report and recommendation adopted*, No. 21-CV-5391 (MKB) (SJB), 2023 WL 375554 (E.D.N.Y. Jan. 24, 2023).

The first question is answered by looking to state contract law. *First Options of Chi., Inc.*, 514 U.S. at 944. Under New York law, "courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds…" such that there is "manifestation or expression of assent necessary to form a contract" that demonstrates the parties' intent to enter an agreement. *Minelli Constr. Co. v. Volmar Constr., Inc.*, 82 A.D.3d 720, 721 (2d Dept. 2011) (internal quotations omitted). Parties cannot delegate the question of whether they formed an agreement to arbitrate to the arbitrator. *Drs. Assocs., Inc. v. Alemayehu*, 934 F.3d 245, 251 n.5 (2d Cir. 2019).

The second question, whether an issue is within the scope of the arbitration agreement, is also determined by the court unless the parties provide "clear and unmistakable evidence" that the parties assented to the delegation of that question to the arbitrator. *PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1198-99 (2d Cir. 1996). Courts should "resolve 'any doubts concerning the scope of arbitrable issues in favor of arbitration.'" *In re Am. Exp. Fin. Advisors Sec. Litig.,* 672 F.3d 113, 135 (2d Cir. 2011) (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983)).

In deciding a motion to compel arbitration, the court uses a similar standard to that of a motion for summary judgment. *Bensadoun v. Jobe-Riat*, 316 F.3d 171, 175 (2d Cir. 2003). The court must "consider all relevant, admissible evidence" and "draw all reasonable inferences in

favor of the non-moving party." *Nicosia*, 834 F.3d at 229 (internal quotations omitted). The party seeking to compel arbitration "must make a prima facie initial showing that an agreement to arbitrate existed before the burden shifts" to the opposing party to show there are issues of material fact as to contract formation. *Hines v. Overstock.com, Inc.*, 380 Fed. App'x 22, 24 (2d Cir. 2010). "If the making of the arbitration agreement or the failure, neglect, or refusal to perform the same be in issue, the court shall proceed summarily to… trial." 9 U.S.C. § 4. However, if there was a valid agreement to arbitrate, the FAA requires the court to stay the case until such arbitration has occurred. *See Katz v. Cellco P'ship*, 794 F.3d 341, 345 (2d Cir. 2015) (holding that "a stay of proceedings [is] necessary after all claims have been referred to arbitration and a stay requested").

## III.    DISCUSSION

### A.    FAA Preempts NY Gen. Bus. Law § 399-c

As a preliminary issue, the Court must decide whether, as Plaintiffs argue, NY Gen. Bus. Law § 399-c ("§ 399-c") renders the agreement null and void. (*See* Mem. in Opp. at 7-8; Compl. ¶ 12.) "If a party says that a contract is invalid, then the court must address that argument before deciding the merits of the contract dispute." *Coinbase, Inc.*, 602 U.S. at 151. Plaintiffs argue that § 399-c renders mandatory arbitration provisions in consumer contracts for goods null and void. (*See* Mem. in Opp. at 7-8; Compl. ¶ 12.) Defendant counters that § 399-c is preempted by the FAA because the contract involves interstate commerce. (Defendant's Memorandum of Law in Support ("Mem. in Supp."), ECF No. 15 at 8.) The Court agrees with Defendant.

The FAA provides that "a written provision…evidencing a transaction involving *commerce* to settle by arbitration… shall be valid, irrevocable, and enforceable…" 9 U.S.C. § 2 (emphasis added). The use of the word "commerce" is understood to refer to Congress's commerce clause power. *Allied-Bruce Terminix Companies, Inc. v. Dobson*, 513 U.S. 265, 274-75 (holding

that the word "commerce" extends the reach of the FAA to the broad reach of Congress's commerce clause power). As a result, the FAA is limited to disputes involving interstate commerce because Congress's commerce clause power is limited to those matters having a substantial effect on interstate commerce. *See id.* at 276; *U.S. v. Lopez*, 514 U.S. 549, 559 (1995).

Plaintiffs do not dispute that the contract at issue here, the T&Cs, affects interstate commerce. Instead, Plaintiffs assert that there is no conflict between § 399-c and the FAA, and the FAA preempts state law only when it conflicts with federal law. (Mem. in Opp. at 6-8.) Plaintiffs further argue, without citing any authority, that there is no conflict because § 399-c does not prohibit all arbitration, but rather only prohibits "mandatory arbitration" where consumers have no choice but to arbitrate. (*Id.* at 7.) The Court is not persuaded by either of these arguments.

There is no dispute that New York courts have found that the FAA preempts state law when a contract implicates interstate commerce. *Schiffer v. Slomin's, Inc.*, 48 Misc. 3d 15, 19 (2d Dept. 2015) (holding where "there exists a nexus with interstate commerce," § 399-c "is displaced by the FAA."); *Smith v. Nobiletti Builders, Inc.*, 177 A.D.3d 807, 810 (2d Dept. 2019) (GBL § 399-c is a categorical rule prohibiting mandatory arbitration clauses in consumer contracts, and thus, "preemption is required where there is evidence establishing a transaction affecting interstate commerce."). New York courts have carved out limited exceptions to this general rule. Specifically, in *Nobiletti Builders*, the defendants were "local commercial entities, who lacked either a multi-state or national presence… [and] the scale and scope of the work to be performed [was] not of such a magnitude as would affect interstate commerce." 177 A.D.3d at 810. Here, Plaintiffs do not contest that the contract at issue affects interstate commerce, and the Supreme Court has held that the FAA applies to consumer telecommunications contracts like the one at issue here. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336, 352 (2011) (holding that the FAA

9

preempts California state law and compels arbitration regarding a contract for "the sale and servicing of cellular telephones"). Therefore, given that § 399-c conflicts with the FAA when the underlying contract involves interstate commerce, and the T&Cs involve interstate commerce, the FAA preempts § 399-c.[1]

Next, Plaintiffs seemingly argue that *Concepcion* was wrongly decided because the holding in that case contradicts the *Erie* doctrine by creating federal common law. (Mem. in Opp. at 8-12); *Concepcion*, 563 U.S. 333 (2011); *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938). Specifically, Plaintiffs argue that "per the *Erie* doctrine of no federal common law… federal courts are to act as courts of that state." (Mem. in Opp. at 11-12.) Plaintiffs imply that there is a conflict between federal and New York law such that the outcome in this case would be different if a New York court were ruling on the issue. (*See id.*) Relying on two Supreme Court decisions, *Guaranty Trust Co. of N.Y. v. York*, 326 U.S. 99 (1945) and *Bernhardt v. Polygraphic Co. of Am.*, 350 U.S. 198 (1956), Plaintiffs argue that since conflicts between state law and federal common law should be resolved to ensure that bringing an action in one forum would not be outcome determinative, and since state court would apply § 399-c rather than the FAA, this Court should do the same. (Mem. in Opp. at 11 ("New York law must be applied… [which] explicitly prohibits the entering of mandatory arbitration agreements.").)

While Plaintiffs may disagree with the Supreme Court's decision in *Concepcion*, this Court is still bound by that decision as it has repeatedly been upheld. Indeed, as recently as 2022, the Supreme Court found that "[t]he FAA's mandate is to enforce *arbitration agreements*" and those

---

[1] Plaintiffs' contention that the contract here was outside the scope of congressional intent for the FAA when it was passed (*see* Mem. in Opp. at 7-8) is similarly unavailing. Plaintiffs erroneously cite *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395 (1967), but the cited quotes in their brief in support of their argument actually come from Justice Ginsberg's Dissent in *Epic Systems*. *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 544 (2018) (Ginsberg, J., dissenting). Plaintiffs cite no controlling authority for the proposition that the FAA does not apply to interstate telecommunications contracts. *Contra Concepcion*, 563 U.S. at 336, 352.

agreements "do not alter or abridge substantive rights: [they] merely change[] how those rights will be processed." *Viking River Cruises, Inc. v. Moriana*, 596 U.S. 639, 653 (2022) (citing *Concepcion*) (emphasis in original). Further, Plaintiffs' reliance on the outcome determinative test is misguided. *See Allied-Bruce*, 513 U.S. at 272-73 (holding that Congress would not have wanted state and federal courts to reach different decisions about the validity of arbitration provisions). In *Bernhardt*, the Supreme Court interpreted the FAA narrowly to avoid direct conflicts with state law when the contract at issue governs interstate commerce. *See Bernhardt*, 350 U.S. at 202. The Supreme Court answered the conflict head-on in *Allied-Bruce*, holding that the conflict of laws can be resolved by reading the FAA as only applying to matters of interstate commerce. *Allied-Bruce*, 513 U.S. at 269, 272-73 (holding that the FAA preempted state law that rendered written arbitration provisions to be invalid and unenforceable). As discussed, there is no dispute that the contract at issue here affects interstate commerce, therefore the FAA applies.

### B.      Formation of the Arbitration Agreement

Given that the FAA applies here, the Court must determine whether there was formation of a valid agreement to arbitrate. *Holick*, 802 F.3d at 394. Plaintiffs contest the formation of a valid contract by arguing that 1) Plaintiffs were fraudulently induced into entering the contract, and 2) that the contract is unconscionable. (Mem. in Opp. 12-13.) Defendant counters that any challenge to formation of the contract through fraudulent inducement or unconscionability must be decided by the arbitrator. (Def. Reply Memorandum in Support ("Reply"), ECF No. 21 at 1.)  Defendant further argues that even if the Court were to reach the merits of this challenge, that Plaintiffs fail to show either fraudulent misrepresentation or unconscionability. (Reply at 8-10.) The Court agrees with Defendant on both points.

As an initial matter, Defendant correctly asserts that given T-Mobile's T&Cs incorporate the American Arbitration Association's ("AAA") rules, the issue of arbitrability of any claim should be decided by the arbitrator. (*See* Mem. in Supp. at 16-17.) The Second Circuit has held that where "parties explicitly incorporate rules that empower an arbitrator to decide issues of arbitrability, the incorporation serves as clear and unmistakable evidence of the parties' intent to delegate such issues to an arbitrator." *Contec Corp. v. Remote Sol., Co.*, 398 F.3d 205, 208 (2d Cir. 2005); *see also Paduano v. Express Scripts, Inc.*, 55 F. Supp. 3d 400, 415 (E.D.N.Y. 2014) ("[V]irtually every circuit to have considered the issue has determined that incorporation of the [AAA] … rules constitutes clear and unmistakable evidence that the parties agreed to arbitrate arbitrability.") (internal quotation omitted). There is no dispute that the T&Cs incorporate the AAA rules, which delegate enforcement of the arbitration agreement to the arbitrator. (T&Cs; Updated T&Cs; Aff. of Rebecca Tingey, ECF No. 17, Ex. B (AAA Consumer Arbitration Rules) R-14(a).) Therefore, the arbitrator, not the Court, must determine the arbitrability of the contract, including Plaintiffs' contentions regarding fraudulent inducement and unconscionability. *See Arkin v. DoorDash, Inc*., No. 19-CV-4357 (NGG) (RER), 2020 WL 4937825, at *5 (E.D.N.Y. Aug. 24, 2020) ("the court may not reach Plaintiff's unconscionability argument because the parties have clearly and unmistakably agreed to delegate issues of enforceability of the arbitration agreement to the arbitrator."); *Wexler v. LVNV Funding, LLC*, No. 22-CV-1348 (PAE), 2023 WL 4305776, at *11 (S.D.N.Y. June 30, 2023) (holding that where a broad arbitration provision incorporates the AAA rules, it "expressly empower[s] an arbitrator to decide issues of arbitrability.")

## 1.    Fraudulent Misrepresentation

Even if the Court were to address the merits of Plaintiffs' argument, Plaintiffs fail to make the required showing for fraudulent misrepresentation. Plaintiffs suggest that the underlying

contract, and therefore the arbitration provision, is unenforceable because Plaintiffs entered into the agreement by relying on Defendant's fraudulent misrepresentations to protect the private information of consumers. (Compl. ¶¶ 129-32.)

Fraudulent misrepresentation is established when "(1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the misrepresentation, and (4) the plaintiff suffered damage as a result of such reliance." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 209 (2d Cir. 2018) (internal quotation omitted); *see also Mandarin Trading Ltd. V. Wildenstein*, 16 N.Y.3d 173, 178 (2011) (same elements). Further, "the misrepresentation at issue 'must be more than mere promissory statements about what is to be done in the future and must rise to the level of material misrepresentations of present facts or promises made with a present, albeit undisclosed, intent not to perform them.'" *Piccirilli v. Benjamin*, 226 A.D.3d 1233, 1236 (3d Dept. 2024) (finding sufficient allegations of fraud where the defendant admitted to having no intent to pay plaintiff upon completion of the contract) (quoting *Bibeau v. Ward*, 193 A.D.2d 875, 877 (3d Dept. 1993)); *see also Spinelli*, 903 F.3d at 210 (a promissory statement about a future action does not amount to a material misrepresentation of fact except if there is an intent not to perform it at the time of contract). Therefore, Plaintiffs must show that T-Mobile never intended to authenticate any user attempting to access a customer's CPNI. *See Cornock v. Murnighan*, 285 A.D.2d 874, 874 (3d Dept. 2001) (holding that there was no fraudulent inducement because plaintiff provided no evidence that defendant never intended to carry through on his promises to abstain from substance use and go to counseling).

Plaintiffs rely on one statement on T-Mobile's website under its privacy policy, acknowledging responsibility to "[p]roperly authenticate any party seeking access to CPNI."

(Compl. ¶ 44.) Plaintiffs fail, however, to allege any facts suggesting that Roitman saw this statement before entering the contract. Plaintiffs' broad allegation that they "relied on T-Mobile's performance of these duties when they agreed to T-Mobile's contract" (*id.* ¶ 46), lacks the specificity required to establish inducement by a fraudulent misrepresentation. *See Ohanian v. Apple Inc.*, No. 20-CV-5162 (LGS), 2022 WL 826415, at *3 (S.D.N.Y. Mar. 18, 2022) (Complaint failed to state a claim for fraudulent misrepresentation when there were no "details regarding when any such statement was made, by whom and where"). Plaintiffs also contend that Roitman was induced into signing the contract because of T-Mobile's statements and advertisements. (Compl. ¶¶ 130-32.) Specifically, Plaintiffs allege Roitman was induced by T-Mobile's assurances that "they have processes in place to ensure compliance with the CPNI rules," including that T-Mobile will "properly authenticate any party… and require a valid photo ID for access." (*Id.* ¶ 44.) Plaintiffs do not allege, however, that they knew what CPNI rules were, or that they relied on these statements before entering the contract. As such, Plaintiffs fail to allege sufficient facts to support a finding of reliance on a misrepresentation.

Even if Plaintiffs could establish reliance, Plaintiffs' allegations that T-Mobile "was very aware of the inadequacy of its security systems" and that "breaches involved T-Mobile's own employees" (*Id.* ¶¶ 48-49), are insufficient to establish fraudulent intent. A party alleging fraud must "state with particularity the circumstances constituting fraud or malice," Fed. R. Civ. P. 9(b), and allege facts "that give rise to a strong inference of fraudulent intent," *Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation omitted). A strong inference of fraudulent intent may be established either "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id*. at 290-91 (quoting *Shields*

*v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)). According to the Complaint, the T-Mobile website states that T-Mobile will require a valid photo identification for access to CPNI, such as SIM cards, and that T-Mobile was aware of SIM swapping schemes for years before this incident. (Compl. ¶¶ 44, 135.) General allegations of Defendant's knowledge of potential security breaches fail to support a finding of fraudulent intent. *See Quiroz v. Beaverton Foods, Inc.*, No. 17-CV-7348 (NGG) (JO), 2019 WL 1473088, at *10-11 (E.D.N.Y. Mar. 31, 2019) (finding the allegations that defendant knew its product's label was false and had a "generalized motive to increases sales of" that product were "not sufficient to support an inference of fraudulent intent); *contra Greene v. Gerber Products Co.*, 262 F. Supp. 3d 38, 66 (E.D.N.Y. 2017) (plaintiffs sufficiently alleged fraudulent misrepresentation when they stated that the defendant had sufficient intent because it sponsored a study on its baby formula, communicated with the FDA about the adverse side effects, and continued to market products without a warning to consumers).

Further, "'general allegations that defendant entered into a contract while lacking the intent to perform it are insufficient… and plaintiff[s] may not… recast [their] claim for breach of contract as an action for fraud.'" *Wall v. CSX Transp., Inc.*, 471 F.3d 410, 415 (2d Cir. 2006) (quoting *New York Univ. v. Cont'l Ins. Co.*, 87 N.Y.2d 308, 318 (1995)). While the promise to check for photo identification may potentially support a breach of contract claim, it does not support a claim for fraudulent misrepresentation such that a contract was never formed. *See Spinelli*, at 209 (where a plaintiff alleges "that the defendant simply misrepresented its intent to perform under a contract, no separate claim for fraud will lie, and the plaintiff must instead" bring a claim for breach of contract). Here, there is no indication, and Plaintiffs do not allege, that T-Mobile did not intend to keep its promise to properly authenticate those who attempted to gain SIM card access.

2.    <u>Unconscionability</u>

Plaintiffs' argument as to the unconscionability of the contract also fails. Plaintiffs contend that the arbitration provision is "unenforceable as it was unconscionable" because of the "disparity in bargaining power, diversity of experience, Plaintiffs' inability to negotiate terms, deceptive tactics involved, obscurity of all terms, as well as unfair limitations on Plaintiffs' recourses[.]" (Mem. in Opp. at 12-13.)

Under New York law, a contract is unconscionable when there is a showing of both procedural and substantive unconscionability. *Ragone v. Atl. Video at Manhattan Ctr.*, 595 F.3d 115, 121 (2d Cir. 2010) (citing *Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009)). There must be a "showing of an absence of meaningful choice… with contract terms which are unreasonably favorable to the other party." *Gillman v. Chase Manhattan Bank, N.A.*, 73 N.Y.2d 1, 10 (1988). Procedural unconscionability involves the process of contract formation "and the alleged lack of meaningful choice" whereas substantive unconscionability involves the terms of the contract. *Ragone*, 595 F.3d at 121-22; *see also Hojnowski v. Buffalo Bills, Inc.*, 995 F. Supp. 2d 232, 239 (W.D.N.Y. 2014) (where "[m]ere inequality of bargaining power" was insufficient for the court to find the contract procedurally unconscionable). "Arbitration agreements are enforceable despite an inequality in bargaining power." *Tsadilas v. Providian Nat. Bank*, 13 A.D.3d 190, 191 (1st Dept. 2004). There are some circumstances where one provision "is so outrageous" such that it is held to be unenforceable only under substantive unconscionability grounds. *Ragone*, 595 F.3d at 122; *see Jones v. Star Credit Corp.*, 298 N.Y.S.2d 264, 266-67 (Sup. Ct. Nassau 1969) (where the salesman charged welfare recipients $900 for a fridge worth $300).

Regarding procedural unconscionability, Plaintiffs' claims of "disparity in bargaining power" and "deceptive tactics" (Mem. in Opp. at 13) are inadequate to support a finding of a lack

of choice at the time of contract formation. For the procedural element, "a court should focus on evidence of high pressure or deceptive tactics, the use of fine print in the contract, and any disparity in experience and education… between the parties." *Brennan v. Bally Total Fitness*, 198 F. Supp. 2d 377, 382-83 (S.D.N.Y. 2002) (holding that the agreement to arbitrate was unconscionable when the defendant 1) only allowed employees fifteen minutes to review a sixteen-page single spaced document; 2) defendant did not address how the arbitration agreement would affect current claims; 3) defendant asked each employee aloud whether they had signed the agreement; and 4) plaintiff was a single, pregnant mother who was dependent on her job for health insurance). Under New York law, disparity in bargaining power is not enough to show that a consumer lacked a meaningful choice, unless coupled with high pressure tactics to gain acceptance of one party's terms. *Id.* at 382. Plaintiffs have provided no factual details that Roitman lacked a meaningful choice when entering the contract with T-Mobile or that T-Mobile used deceptive tactics to induce Roitman into entering the contract. Therefore, Plaintiffs cannot succeed on procedural unconscionability.

Moreover, as Defendant points out, T-Mobile gives customers thirty days to opt out of the arbitration provision. (T&Cs; Receipt; Mem. in Supp. at 11-12.) The opt-out option alleviates any concern of unconscionability. *See Saizhang Guan v. Uber Technologies, Inc.*, 236 F. Supp. 3d 711, 730-31 (E.D.N.Y. 2017) (finding that the presence of a 30-day opt-out provision "substantially negates any challenge of procedural unconscionability") (citing *Tsadilas*, 13 A.D.3d at 191 (finding arbitration provision not unconscionable due to the inclusion of an opt-out opportunity)); *see also Teah v. Macy's Inc.*, No. 11-CV-1356 (CBA) (MDG), 2011 WL 6838151, at *5 (E.D.N.Y. Dec. 29, 2011) (finding that the arbitration agreement was not procedurally unconscionable because there was an opt-out option and the plaintiff did not allege that he failed to read or understand the agreement).

Plaintiffs also fail to allege substantive unconscionability. Substantive unconscionability looks to the terms of the agreement to determine if the terms are unreasonably favorable to the nonmoving party. *Gillman*, 73 N.Y.2d at 12 (holding that the agreement was not substantively unconscionable because the terms "were not so overbalanced in favor of" the defendant). Examples of substantive unconscionability could include "inflated prices, unfair termination clauses, unfair limitations on consequential damages and improper disclaimers of warranty." *State of N.Y. v. Wolowitz*, 96 A.D.2d 47, 67-68 (2d Dept. 1983). Plaintiffs' theory of substantive unconscionability appears to be based on T-Mobile's exclusive authority to modify, change, or terminate the contract. (*See* Mem. in Opp. at 13 (citing *Coady v. Nationwide Motor Sales Corp.*, 32 F.4th 288, 292 (4th Cir. 2022) (finding under Maryland law, a promise to arbitrate is illusory "if the employer reserves the right to alter, amend, modify, or revoke the Arbitration Policy... at any time with or without notice.") (internal quotation omitted)).) Plaintiff's position is contrary to the Second Circuit's interpretation of New York Law. "Under New York law, a contract is not illusory merely because its terms give discretion to one party to the contract. . . as every contract encompasses the implied duty of good faith and fair dealing." *Lebowitz v. Dow Jones & Co.*, 508 Fed. App'x 83, 84-85 (2d Cir. 2013) (citations omitted); *see also Bassett v. Elec. Arts, Inc.*, 93 F. Supp. 3d 95, 106 (E.D.N.Y. 2015) (holding that the arbitration agreement was not illusory "simply because [the defendant] had the unilateral right to modify the agreement"). Accordingly, Plaintiffs' argument that the arbitration provision is illusory and, therefore, substantially unconscionable, is not supported by New York law.

## C.    Scope of the Arbitration Agreement

As to the second prong of the analysis, Plaintiffs dispute whether the claims are within the scope of the arbitration agreement. (Mem. in Opp. at 13-15.) Plaintiffs contend that the claims

"arise outside of the contract with Defendant" because T-Mobile's actions were criminal and unforeseeable at the time of contract and, therefore, are not covered by arbitration. (Mem. in Opp. at 14; *see also* Compl. ¶ 7.) Defendant argues that Plaintiffs' claims "arise directly from T-Mobile's services, privacy policy, and products", and thus fall within the scope of the arbitration provision that has been interpreted by courts to be "very broad." (Mem. in Supp. at 19-20 (citing cases).) The Court again agrees with Defendant.

The Second Circuit limits the scope of the FAA to "agreements to arbitrate controversies that 'arise out of' the parties' contractual relationship that is, controversies that were caused by the relationship." *Davitashvili v. GrubHub Inc.*, 131 F.4th 109, 119 (2d Cir. 2025) (quoting *Viking River Cruises*, 596 U.S. at 652 n.4). The Second Circuit has also found that "[t]he words 'any and all' are elastic enough to encompass disputes over whether a claim is… within the scope of arbitration." *PaineWebber Inc.*, 81 F.3d at 1199. Following the decision in *PaineWebber*, New York courts have concluded that when the language of a contract commits all issues to arbitration, then the issue of the scope of the agreement should be decided by the arbitrator. *See Smith Barney, Inc. v. Hause*, 238 A.D.2d 104, 106 (1997) (finding that the language of "any controversy arising out of or relating to… [plaintiff's] accounts… or… with respect to this agreement…" extends to a determination of the scope of the agreement). The T-Mobile contract states, "we and you each agree that… *any and all claims or disputes in any way related to or concerning* this agreement, our privacy policy, our services, equipment, devices or products, including any billing disputes, will be resolved by binding arbitration or in small claims court." (Sanchez Aff., Ex. 3) (emphasis added.) Consistent with this broad language, issues of arbitrability, including the scope of the agreement, must be decided by the arbitrator if the parties have expressly agreed to delegate those issues to the arbitrator. *See McCoy v. Dave & Buster's, Inc.*, No. 15-CV-465 (JFB) (AYS), 2018

WL 550637, at *7 (E.D.N.Y. Jan. 24, 2018) (finding that arbitration provision that incorporated AAA rules delegated arbitrability decisions to the arbitrator, including questions as to the scope of the agreement.)

Even if the Court could decide this issue, the Court disagrees with Plaintiffs' position that their claims fall outside the scope of the agreement. Plaintiffs argue that there is "no direct relationship between the dispute and the performance of duties specified by the contract," such that the arbitration clause does not apply. (Mem. in Opp. at 15.) Plaintiffs support this position by relying on *Doe*, where the Eleventh Circuit held that causes of action arising from a sexual assault fell outside the arbitration agreement in the plaintiff's employment contract because the Defendant could have engaged in the alleged tortious conduct "even in the absence of any contractual or employment relationship with [the plaintiff]." *Doe v. Princess Cruise Lines Ltd*, 657 F.3d 1204, 1219 (11th Cir. 2011). *Doe* is inapposite, however, because T-Mobile could not have engaged in the conduct that led to Plaintiffs' allegations in the absence of a contractual relationship. Moreover, in a factually similar case in this district involving the same T-Mobile arbitration provision, the court concluded that "any doubts concerning the scope of arbitrable issues… [should be decided] in favor of arbitration." *Middleton v. T-Mobile US, Inc.*, No. 20-CV-3276 (NGG) (JRC), 2022 WL 16828226, at *9 (E.D.N.Y. Aug. 24, 2022) (finding that the plaintiff's claims against T-Mobile, for allowing unauthorized users access to the plaintiff's phone resulting in the theft of $8.7 million in cryptocurrency, fell within the scope of the arbitration agreement). The Court sees no reason not to follow that holding here. Plaintiffs' causes of action are directly related to the promise T-Mobile made when entering the contract: that T-Mobile would authenticate users attempting to access its customers' CPNI. (Compl. ¶¶ 44, 83.) The alleged failure of T-Mobile to keep that promise directly relates to the dispute because T-Mobile allegedly granted access to Plaintiffs' CPNI without

authenticating the unknown third party, resulting in unauthorized access to Plaintiffs' financial accounts. (Compl. ¶ 1.) Therefore, Plaintiffs' claims arise directly out of the contract they had with T-Mobile.

In sum, by agreeing to the broad arbitration agreement and not exercising their right to opt out, Plaintiffs consented to arbitrate any claims that arose from their contract with T-Mobile, including the claims at issue here. (Sanchez Aff. ¶ 20; T&Cs.)

## IV.    **CONCLUSION**

For the foregoing reasons, the Court respectfully recommends granting Defendant's motion to compel Plaintiffs to arbitrate their claims. The FAA mandates "a stay of proceedings when all of the claims in an action have been referred to arbitration and a stay requested." *Katz*, 794 F.3d at 345. Defendant has requested a stay of this case pending the completion of arbitration. (Mem in Supp. at 20-21.) The Court respectfully recommends staying this case pending arbitration.

A copy of this Report and Recommendation is being served on all parties via ECF. Within 14 days of service, any party may serve and file specific written objections to this Report and Recommendation. 28 U.S.C. § 636(b)(1)(C); Fed. R. Civ. P. 72(b). Any requests for an extension of time to file objections shall be delivered to Judge Vitaliano. If a party fails to object timely to this Report and Recommendation, it waives any right to further judicial review of this decision. *See Miller v. Brightstar Asia, Ltd.*, 43 F.4th 112, 120 (2d Cir. 2022).

**SO ORDERED.**

Dated: Brooklyn, New York
July 28, 2025

*Lara K. Eshkenazi*
LARA K. ESHKENAZI
UNITED STATES MAGISTRATE JUDGE